IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-99

No. 218A20

Filed 27 August 2021

IN THE MATTER OF: M.A.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 27 February 2020 by Judge Shamieka L. Rhinehart in District Court, Durham County. This matter was calendared for argument in the Supreme Court on 21 June 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*The Law Office of Derrick J. Hensley, PLLC, by Derrick J. Hensley, for petitioner-appellee Durham County Department of Social Services.*

*Carrie A. Hanger for appellee Guardian ad Litem.*

*Peter Wood for respondent-appellant mother.*

HUDSON, Justice.

Respondent, the mother of M.A. (Mark)[1], appeals from the trial court's order terminating her parental rights on the grounds of neglect and willful failure to make reasonable progress to correct the conditions that led to the child's removal from the home. Because we hold the trial court did not err in concluding that grounds existed to terminate respondent's parental rights under N.C.G.S. § 7B-1111(a)(1) based on

---

[1] A pseudonym is used to protect the juvenile's identity and for ease of reading.

neglect, we affirm the trial court's order.

## I.    Facts and Procedural History

On 1 June 2015, the Durham County Department of Social Services (DSS) obtained nonsecure custody of then ten-month-old Mark and his fifteen-year-old brother, J.M.[2], and filed a juvenile petition alleging they were neglected juveniles. In the petition, DSS alleged that respondent and the children were chronically homeless and had been staying "from place to place." The petition further alleged that on 21 May 2015, J.M. returned from school to the place where they had been staying and was unable to locate respondent. Respondent did not leave any information or instructions on where she could be found.  After still not being able to find respondent that evening, J.M. went to his maternal grandmother's senior residential complex at 1:00 a.m. to have a place to stay. On 1 June 2015, the maternal grandmother informed DSS that J.M. could no longer stay with her as her residence did not allow children, and she was concerned about being evicted. DSS believed Mark was with respondent, however she had not been located at the time of filing the petition.

On 2 June 2015, respondent showed up at DSS's office with Mark. The social worker addressed the allegations and petition with respondent and explained that DSS had obtained legal custody of her children on 1 June 2015. Respondent left Mark

---

[2] J.M. has reached the age of majority and is not a part of this appeal. Therefore, we discuss the facts primarily as they relate to Mark.

in the custody of DSS, and he was placed in foster care.

¶ 4    On 20 August 2015, the trial court entered an order adjudicating the children as neglected juveniles based on stipulations by the parties. In order to correct the conditions that led to the children's removal, the trial court ordered respondent to complete a psychological evaluation with collateral contacts and objective testing, and follow any recommendations for mental health treatment; complete a parenting class and demonstrate and verbalize an understanding of the skills learned; obtain and maintain stable housing; obtain and maintain stable employment; demonstrate an ability and willingness to meet the children's needs; refrain from substance abuse; maintain contact with the social worker and provide current contact information; and maintain visitation with the children. The trial court granted respondent two hours of supervised visitation every other week.

¶ 5    Following a review hearing held 17 November 2015, the trial court entered an order on 11 January 2016 continuing custody with DSS and placing Mark with his paternal great grandmother. The trial court found that respondent was employed and seeking housing, had started parenting classes, had completed a substance abuse assessment from which no services were recommended, and had completed a psychological evaluation.

¶ 6    In a review order entered on 7 June 2016, the trial court set the permanent plan for Mark as reunification with a secondary plan of guardianship. The trial court

found that respondent had obtained a one-bedroom home through Housing for New Hope. DSS had assessed the home on 31 May 2016 and found it to be appropriate for Mark. The trial court further found that respondent was making progress and was not a safety risk to Mark during visits but that she still needed to complete the parenting course and obtain sufficient income to meet the needs of her children. The trial court allowed respondent unsupervised visitation with Mark with the possibility of transitioning to overnight visits. In addition to respondent's prior case plan requirements, the trial court ordered respondent to obtain a domestic violence assessment due to a history of domestic violence.

¶ 7     On 10 August 2016, Mark was placed in a foster home after the paternal great grandmother indicated she could no longer care for him due to her health. On 8 September 2016, respondent was awarded overnight unsupervised visits on the condition that the father not be present.

¶ 8     In a 2 May 2017 permanency-planning-review order, the trial court continued the permanent plan of reunification but changed the secondary plan to adoption. The trial court found that respondent completed a domestic violence assessment in December 2016 which recommended mental health treatment and domestic violence counseling. Respondent completed a mental health assessment on 28 February 2017, and no treatment was recommended. However, DSS was concerned that respondent underreported her domestic violence history. Respondent completed an addendum to

the initial assessment on 15 August 2017. However, the trial court found that respondent "continued to minimize her domestic violence history and its impact on her."

After another hearing, the trial court subsequently entered a permanency-planning-review order continuing the permanent plan of reunification with a secondary plan of adoption. The trial court found that respondent had housing and had been employed at the same company for the past eighteen months. However, the trial court found that respondent's participation in domestic violence counseling had been "sporadic" and that respondent did not fully acknowledge the effects of her domestic violence history, nor did she fully understand the reasons the trial court was ordering her to engage in domestic violence counseling.

On 24 May 2018, DSS filed a motion to terminate respondent's parental rights to Mark alleging the grounds of neglect and willfully leaving the child in foster care for more than twelve months without making reasonable progress to correct the conditions that led to his removal from the home. *See* N.C.G.S. § 7B-1111(a)(1)–(2) (2019). DSS alleged that respondent failed to demonstrate a willingness and ability to meet Mark's needs due to respondent's "delays in scheduling and attending assessments and treatment, her sporadic attendance at treatment, incomplete disclosures regarding problems and failure to utilize all visitation opportunities with the child." DSS further alleged that respondent "exhibit[ed] a pattern of behavior of

disengagement and lack of follow through" as she had "several older children for whom she failed to engage in services in order to safely parent th[o]se children."

¶ 11 Following a hearing on 20 and 23 July 2018, the trial court entered a permanency-planning-review order on 28 August 2018 changing the permanent plan to adoption with a secondary plan of guardianship. The trial court found that although respondent had stable housing, she had yet to complete the Parenting Capacity Assessment that was ordered in October 2017 which would address respondent's understanding of the impact of her domestic violence and her ability to keep Mark and herself safe. The trial court further found that respondent missed a permanency planning review meeting and failed to provide an explanation, and that respondent was not at her home when the social worker conducted a pop-in visit during Mark's unsupervised visitation. The trial court found that it is not possible for Mark to return to respondent's care within the next six months because she "has not completed her court ordered services, especially the Parenting Capacity Assessment, . . . and her sporadic attendance of domestic violence counseling."

¶ 12 The trial court conducted a termination-of-parental-rights hearing on 15 August, 9 and 15 October, 14 November, and 6 and 11 December 2019. On 27 February 2020, the trial court entered an order concluding that respondent's parental rights were subject to termination on the grounds of neglect and willful failure to make reasonable progress to correct the conditions that led to Mark's removal from

the home. The trial court further concluded that termination of respondent's parental rights was in Mark's best interests. Accordingly, the trial court terminated respondent's parental rights. Respondent appealed.

## II.    Analysis

On appeal, respondent contends the trial court erred by adjudicating grounds for termination of her parental rights under N.C.G.S. § 7B-1111(a)(1) and (2). Because only one ground is necessary to terminate parental rights, we only address respondent's arguments regarding the ground of neglect. *See In re A.R.A.*, 373 N.C. 190, 194 (2019).

We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. 101, 111 (1984). Unchallenged findings of fact "are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407 (2019). "Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *Id.* "The trial court's conclusions of law are reviewable de novo on appeal." *In re J.O.D.*, 374 N.C. 797, 801 (2020).

A trial court may terminate parental rights when it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1). A neglected juvenile is one "whose parent, guardian, custodian, or

caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019). In some circumstances, a trial court may terminate a parent's rights based on neglect that is currently occurring at the time of the termination hearing. *See, e.g.*, *In re K.C.T.*, 375 N.C. 592, 599–600 (2020) ("[T]his Court has recognized that the neglect ground can support termination . . . if a parent is presently neglecting their child by abandonment."). However, for other forms of neglect, the fact that "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing" would make "requiring the petitioner in such circumstances to show that the child is currently neglected by the parent . . . impossible." *In re N.D.A.*, 373 N.C. 71, 80 (2019) (quoting *In re L.O.K.*, 174 N.C. App. 426, 435 (2005)). In this situation, "evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights[,]" but "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715 (1984). After weighing this evidence, the trial court may find the neglect ground if it concludes the evidence demonstrates "a likelihood of future neglect by the parent." *In re R.L.D.*, 375 N.C. 838, 841 (2020) (quoting *In re D.L.W.*, 368 N.C. 835, 843 (2016)). Thus, even in the absence of current neglect, the trial court may adjudicate neglect as a ground for

termination based upon its consideration of any evidence of past neglect and its determination that there is a likelihood of future neglect if the child is returned to the parent. *In re R.L.D.*, 375 N.C. at 841 n.3.

¶ 16 Respondent acknowledges that Mark was previously adjudicated to be a neglected juvenile but challenges the trial court's finding as to the likelihood of a repetition of neglect.

**A. Challenged Findings of Fact**

¶ 17 Respondent first challenges the following findings of fact:

> 11. That at the time of this termination hearing, the Petitioner demonstrated by and through the evidence presented that conditions rising to the level of neglect existed during the pendency of the termination action in that the child lived in an environment injurious and that the parents did not provide proper care or supervision in that there continued to be unstable housing, unresolved issues of domestic violence, the father's abandonment and issues surrounding the parent's willingness and ability to provide proper supervision and care in the home.
>
> . . . .
>
> 64. The [c]ourt is aware that there has not been any reporting of any incidents of domestic violence since adjudication, but the [c]ourt is concerned that the mother has continued to underreport her history of domestic violence. Dr. Harris-Britt did state that the mother did not demonstrate an understanding of the skills she may have learned in her domestic violence counseling. The [c]ourt finds that the mother was unable to articulate the skills she learned in her domestic violence counseling with KKJ Services as testified to in this hearing.
>
> 65. The [c]ourt acknowledges the reasons [Mark] was

neglected in the underlying adjudication and disposition; however, the [c]ourt must assess risk and harm. This [c]ourt does not believe that the mother could protect herself or [Mark] from being in a situation of domestic violence or being able to protect [Mark] if she found herself in that situation. The [c]ourt finds that the mother has yet to progress with her understanding of domestic violence and how it could impact her and what she would need to do to protect herself and [Mark].

66. The [c]ourt also finds that the reason that [Mark] was removed was because of instability of housing. The [c]ourt looks at how differently the mother's housing status has changed from when [Mark] entered in the custody of DSS. At the time this case was adjudicated, the mother resided at Urban Ministries. The mother was able to locate a one-bedroom apartment and resided there for about three years. However, the mother moved in April of 2019 after having stable housing for a good period to move to a studio apartment with a co-worker where she is not on the lease. The mother reports that she moved to be closer to a better school; however, her housing situation remains unstable. The mother did not communicate to DSS that she had moved until September of 2019 when she requested that DSS look at her home so she could have overnight supervised visits. When [DSS] inquired as to who stayed with the mother, she did not provide a name of who stayed with her. It was not only until the hearing, that the mother revealed that she was staying with a roommate and the name of the roommate was given. Apparently, the mother's roommate is a male co-worker.

. . . .

68. The [c]ourt wonders where the visits were occurring during the time period where the mother was staying at her new residence that had not been approved for overnight weekend visits. The mother would have known that it was important to have been in place at the apartment that was approved for her visits so that the

social worker could bring back to the [c]ourt information about how the visits were going. During this same timeframe, the mother was requesting drop off and pick up of [Mark] at various public places but not the residence that was approved for her visits.

. . . .

70. The [c]ourt finds that the fact that the mother was having unsupervised overnight weekend visits made her unmotivated in addressing the concerns of the court. The mother was ordered to complete the PCA in November of 2017 and it was not completed until November of 2018. The mother did not tell social worker Dearing that she had moved in April of 2019; the mother requested an assessment of her "new" home, approximately five months after she moved. The [c]ourt is baffled as to why the mother would not tell the social worker she had moved.

71. The [c]ourt finds that the mother has been working, but the [c]ourt still has concerns as to whether she can maintain her own household with her own efforts. The [c]ourt also finds that the mother has had the type of visitation she has had for a good period, but the court still finds that: 1) she still does not have stable housing and that she continues to struggle in maintaining a safe and functioning home for [Mark]; 2) the [c]ourt also is concerned because Dr. April Harris-Britt has made recommendations for an ACTT team and intensive mental health services along with her having domestic violence counseling and the mother still has yet focused and address[ed] the core issues of domestic violence about which the [c]ourt remains concerned. The [c]ourt is dubious of the mother's participation for services with KKJ Services and whether the mother's participation with this program will decrease the likelihood that [Mark] is returned to conditions resulting in his neglect given her lack of insight and her high level of distrust.

72. The [c]ourt also gives great weight to how long [Mark] has been in the care of DSS since 2015. He has been in the

care of DSS for most of his life. The mother has had ample times to address these issues that continue to pose a risk if [Mark] were returned to her care. The mother lives in a small apartment with a man and pays half the rent and not paying the utilities. The [c]ourt does not know whether [Mark] was kept safe or properly supervised and cared for during these overnight visits. When the social worker would go to the residence that was approved for her visits for unannounced pop-in visits, the mother and [Mark] were not there. The [c]ourt does not know what, if anything, [Mark] was exposed to and the mother knew that pop-in visits were required by . . . DSS.

. . . .

74. The [c]ourt finds that there is a likelihood of repetition of neglect if the juvenile was returned to the home of the Respondents[3] based upon the findings of fact herein and the underlying permanency planning orders relied upon and incorporated herein.

75. Respondents' failure to adequately and timely address the issues that led to the removal of the juvenile from the home constitutes neglect. That failure to adequately and timely address the neglectful behaviors, renders the Respondents incapable of providing adequate care and supervision of the juvenile. The probability that the neglect will be repeated and said incapability will continue in the future is high given the failure of the Respondents to address and alleviate the issues.

76. The Respondent Mother has demonstrated a settled pattern of neglect of the juvenile, and this pattern is likely to continue into the foreseeable future. The [c]ourt finds there is a reasonable probability that such neglect would be continued and repeated if the juvenile was to be returned to the care, custody, or control of the Respondents.

---

[3] Although M.A.'s father was a respondent in this case, he is not party to this appeal.

. . . .

81. The [c]ourt finds that, as of the time of the termination hearing, the Respondent Mother has not made reasonable progress under the circumstances to correct the conditions that led to the juvenile's removal in that while she did maintain housing for a period of time, she moved without notifying the social worker during a time when she was being allowed unsupervised overnight visitations. There were periods of time when the social worker could not complete any pop-in visits to observe and monitor these visits. The mother stopped having drop-offs and pickups at her known residence. She then relocated to an apartment residence with an undisclosed male roommate and no lease. She failed to cooperate with the mental health recommendations. She did not participate in domestic violence treatment to the satisfaction of this [c]ourt. She failed to comp[l]ete the Parenting Capacity Assessment until a year after it was ordered and then failed to demonstrate the willingness and ability to comply with the recommendations from that assessment. These last two services were ordered by this [c]ourt in order to remedy the conditions which led to the juvenile's adjudication, namely [the] mother's homelessness and housing instability and the contributions [of] her history of Domestic Violence which the [c]ourt found was critical in the neglect of this juvenile. The Respondent Mother willfully failed and refused to substantially complete the services as ordered by the [c]ourt in a reasonable manner and timeframe.[4]

¶ 18     Respondent raises no specific evidentiary challenges to these findings but "disputes" them generally. After reviewing the record, including the testimony from the termination hearing and the unchallenged findings of fact, we hold the challenged

---

[4] Although respondent challenges finding of fact 81 in her argument regarding grounds for termination under N.C.G.S. § 7B-1111(a)(2), the finding is also relevant to support the ground of neglect, so we address it here.

findings are supported by competent evidence in the record. First, the social worker testified at the termination hearing regarding respondent's progress on her case plan over the four years that Mark had been in DSS custody, including testimony regarding respondent's housing situation, her participation in domestic violence treatment, and her visitations with Mark. The social worker testified that respondent no longer had stable housing and did not inform DSS that she had relocated until five months after she had moved, had not completed domestic violence treatment as recommended by her case plan, and was not always present at her home when the social worker attempted random pop-in visits during several of respondent's unsupervised visitation periods. The social worker also testified that respondent delayed in completing some services, including taking one year to complete the Parenting Capacity Assessment, which respondent was ordered to complete to address respondent's domestic violence issues.

¶ 19        Furthermore, the psychologist who conducted the Parenting Capacity Assessment testified at the termination hearing that respondent had "extremely limited insight into how her own behaviors had impacted her children, why they were in care[,]" and that respondent's "inability to recognize or acknowledge the really important events that have happened for her as well as for her children will impact her ability to . . . benefit from services" and "ultimately will impact her ability to provide a safe and nurturing appropriate home for [Mark]." The Parenting Capacity

Assessment, which was admitted into evidence at the termination hearing, stated that respondent "continues to display an unwillingness to accept accountability and a continuous lack of consistency in completing the actions necessary to meet the requirements of the court for reunification." The assessment also stated that, although respondent participated in domestic violence classes, "she did not demonstrate or verbalize understanding of the skills she may have received in [those] classes."

¶ 20        Finally, the trial court found in other unchallenged findings that respondent moved to a studio apartment without informing DSS and was unable to provide a lease to the apartment nor the name of the roommate that lived with her. As a result, DSS was not able to approve respondent's residence for overnight visitations. The trial court also found that respondent had not provided any documentation to DSS showing that she was participating in mental health counseling, as recommended by her domestic violence assessment, and that respondent informed the social worker that she was receiving domestic violence counseling at KKJ, where she "participates in support group sessions where the participants discuss outcomes for domestic violence." The trial court further found that although respondent was present at her home during some of DSS's pop-in visits during her visitations with Mark, there were at least ten times where respondent was not at her home with Mark. Because there is substantial evidence in the record to support the challenged findings, including

testimony from the termination hearing and other unchallenged findings, we reject respondent's general challenge to the trial court's findings of fact.

¶ 21          Respondent also argues that findings of fact 64 and 65, which relate to respondent's domestic violence issues, are mere speculation by the trial court and based on "pure conjecture."[5] "The [trial] court has the responsibility of making all reasonable inferences from the evidence presented." *In re N.P.*, 374 N.C. 61, 65 (2020). "Such inferences, however, cannot rest on conjecture or surmise. This is necessarily so because an inference is a permissible conclusion drawn by reason from a premise established by proof." *In re K.L.T.*, 374 N.C. 826, 843 (2020) (cleaned up) (quoting *Sowers v. Marley*, 235 N.C. 607, 609 (1952)).

¶ 22          We conclude the trial court's inferences in findings of fact 64 and 65 are not based merely on conjecture. The trial court could reasonably infer from the evidence presented that respondent would not be able to protect herself or Mark from being in a domestic violence situation or to protect Mark if she found herself in that situation. In the termination order, the trial court acknowledged that there had not been any reports of incidents of domestic violence since the adjudication in 2015. However, the trial court expressed concern that respondent was underreporting her domestic violence history. The trial court also found that respondent was unable to articulate

---

[5] Respondent also challenges finding of fact 68 for the same reasons, however, that finding is not necessary to support the ground of neglect.

the skills she learned in her domestic violence counseling and that she had not progressed with her understanding of domestic violence, how it could impact both her and Mark, and what she would need to do to protect herself and Mark. At the termination hearing, the psychologist that conducted respondent's Parenting Capacity Assessment testified that respondent was "extremely limited in her ability and willingness to share information about her domestic violence history" and "oftentimes" would underreport that information. The psychologist also testified that respondent's "inability to recognize or acknowledge" her history would impact her ability to benefit from services and ultimately impact her ability to provide a safe and nurturing home for Mark. The trial court could reasonably infer from this evidence that respondent would not be able to utilize the learned skills in order to protect herself and Mark from a domestic violence situation.

¶ 23     Respondent also "disputes the findings that she had failed to obtain stable housing." She contends that one move in over three years "is hardly unstable" and that the only issue with her housing "seemed to be that DSS had not had time to investigate her new residence or her new roommate." We disagree.

¶ 24     The evidence and findings support the trial court's conclusion that at the time of the termination hearing, respondent did not have stable housing. The trial court found that respondent had obtained stable housing for three years while she was residing in the one-bedroom home she had been renting that DSS found to be

appropriate for Mark. However, around April of 2019, respondent moved to a studio apartment that she shared with a male coworker where she was not named on the lease. The trial court found that respondent did not inform DSS of the move until five months later when she requested a home assessment for overnight visits, that respondent was not forthcoming about the move when questioned by the social worker, and that respondent failed to provide a name for her roommate until the termination hearing. Based on these findings, the trial court found that although respondent had obtained stable housing "for a good period[,]" at the time of the termination hearing "her housing situation remain[ed] unstable."

¶ 25    Although one relocation in a period of three years does not necessarily indicate instability, respondent moved from an approved one-bedroom home where she was the only tenant named on the lease to a shared studio apartment where she was not named as a tenant on the lease, and thus she has no legal right to remain in the home. Respondent testified at the termination hearing that she split the rent with her roommate but that the roommate paid for the utilities. Respondent also testified that she had moved to the apartment "several months ago" but she did not know the exact date and that she was "planning on finding a two-bedroom apartment or a house." Therefore, we conclude the trial court's findings that respondent did not have stable housing at the time of the termination hearing are sufficiently supported.

**B. Repetition of Neglect**

Respondent next argues the trial court erred in determining there was a likelihood of future neglect. Citing N.C.G.S. § 7B-903.1(c), respondent contends that the trial court's finding of a probability of future neglect is inconsistent with its determination that she continued to have unsupervised visits for the three years leading up to the termination hearing.

Subsection 7B-901.3(c) provides that

> [i]f a juvenile is removed from the home and placed in the custody or placement responsibility of a county department of social services, the director shall not allow unsupervised visitation with or return physical custody of the juvenile to the parent, guardian, custodian, or caretaker without a hearing at which the court finds that the juvenile will receive proper care and supervision in a safe home.

N.C.G.S. § 7B-903.1(c) (2019). The Juvenile Code defines a "[s]afe home" as "[a] home in which the juvenile is not at substantial risk of physical or emotional abuse or neglect." N.C.G.S. § 7B-101(19).

Respondent argues that because the trial court did not change her unsupervised visitation during the four-month period in which the termination hearing was held, "the court must have determined that [respondent] had continued to provide a safe home free of neglect." She contends that although the trial court did not specifically find in the termination order that respondent had provided a safe home free of neglect for Mark, it "implicitly reached those conclusions when it continued to allow unsupervised visits." Therefore, respondent contends that the trial

court's finding of a probability of neglect was "irreconcilably inconsistent" with allowing continued unsupervised visits. She further argues that even if the evidence could support neglect, allowing respondent to continue to exercise unsupervised visitation was "internally inconsistent" with a finding of a probability of future neglect. Respondent's arguments are misplaced.

¶ 29    Pursuant to Rule 58 of the North Carolina Rules of Civil Procedure, "a judgment is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court." N.C.G.S. § 1A-1, Rule 58 (2019). Additionally, "a trial court's oral findings are subject to change before the final written order is entered." *In re A.U.D.*, 373 N.C. 3, 9–10 (2019). Thus, even assuming the trial court had determined that respondent provided a safe home during the termination hearing, the trial court's finding was subject to change until the final order was entered. Because the termination order does not continue respondent's unsupervised visitation, and in fact restricts respondent to supervised visitation, the trial court did not simultaneously find that respondent could provide a safe home for Mark and that there was a likelihood of repetition of neglect. Similarly, respondent's assertion that the trial court's findings are "internally inconsistent" is without merit. The trial court did not allow respondent to continue to exercise unsupervised visitation in the termination order in which it found a probability of future neglect.

¶ 30    Moreover, the fact that respondent was previously approved for unsupervised

overnight visitation at a prior address did not preclude the trial court from later finding a likelihood of repetition of neglect when respondent's circumstances changed. At the time of the termination hearing, respondent was no longer residing at her approved one-bedroom home but was sharing a studio apartment with an unknown roommate, was not listed on the lease as a tenant, and was not paying utilities for the apartment. Respondent failed to inform DSS of the move for five months despite continuing to exercise her unsupervised overnight visitation. Therefore, we reject respondent's arguments.

Finally, respondent argues the evidence presented at the termination hearing did not support the trial court's finding of a probability of future neglect. We disagree.

"A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.A.*, 374 N.C. 865, 870 (2020) (quoting *In re M.J.S.M.*, 257 N.C. App. 633, 637 (2018)). However, "[a]s this Court has previously noted, a parent's compliance with his or her case plan does not preclude a finding of neglect." *In re J.J.H.*, 376 N.C. 161, 185 (2020) (citing *In re D.W.P.*, 373 N.C. 327, 339–40 (2020) (noting the respondent's progress in satisfying the requirements of her case plan while upholding the trial court's determination that there was a likelihood that the neglect would be repeated in the future because the respondent had failed "to recognize and break patterns of abuse that put her children at risk")); *see also In re Y.Y.E.T.*, 205 N.C. App. 120, 131 (explaining that a "case plan is not just a check

list" and that "parents must demonstrate acknowledgement and understanding of why the juvenile entered DSS custody as well as changed behaviors"), *disc. review denied*, 364 N.C. 434 (2010). Although respondent had made some progress on the requirements of her case plan, she had not addressed the conditions that resulted in Mark's placement in DSS custody.

¶ 33     The trial court found that Mark was removed from respondent's care and adjudicated to be a neglected juvenile primarily due to respondent's unstable housing and history of domestic violence. The trial court also found that conditions rising to the level of neglect existed during the pendency of the termination action due to respondent's continued unstable housing and unresolved issues of domestic violence. Respondent had over four years to address the conditions that led to Mark's removal but failed to do so. Although respondent attended some domestic violence counseling, the trial court found that she "did not participate in domestic violence treatment to [its] satisfaction" and that she did not demonstrate an understanding of her domestic violence issues, how they impacted her and Mark, and how to protect herself and Mark in a domestic violence situation. The findings also show that although respondent had obtained stable housing for a period of three years, at the time of the termination hearing respondent was sharing a studio apartment with a male coworker and was not on the apartment lease as a tenant. Respondent was not forthcoming about her move and did not inform DSS of the move or request an

assessment of her new home until five months after she moved despite continuing to exercise her unsupervised visitation. The trial court also found that respondent "failed to comp[l]ete the Parenting Capacity Assessment until a year after it was ordered and then failed to demonstrate the willingness and ability to comply with the recommendations from that assessment." Finally, the trial court found that respondent's failure to adequately and timely address the issues that led to Mark's removal from her care constitutes neglect.

¶ 34      We hold the evidence and findings demonstrate that Mark is likely to be neglected again if returned to respondent's care due to her lack of stable housing and unresolved domestic violence issues and that they support the trial court's ultimate finding that there is a likelihood of repetition of neglect. *See In re M.A.*, 374 N.C. at 870 (holding that, although the respondent claimed to have made reasonable progress in addressing elements of his case plan, the trial court's findings regarding the respondent's failure to adequately address the issue of domestic violence, which was the primary reason that the children had been removed from the home, were, "standing alone, sufficient to support a determination that there was a likelihood of future neglect"). As a result, the trial court did not err by determining that grounds existed under N.C.G.S. § 7B-1111(a)(1) to terminate respondent's parental rights. Respondent does not challenge the trial court's dispositional determination that termination of her parental rights was in Mark's best interests. *See* N.C.G.S. § 7B-

1110(a) (2019). Accordingly, we affirm the trial court's order terminating respondent's

parental rights.

AFFIRMED.